I'm glad the week is over, but I'm sorry that we're going to be deprived of his company after this. Hopefully we can get him back here again someday. Again, thank you very much. Thank you. Radiant Matter of Torres v. Comm Social Security. Good morning. My name is Abraham Walter. I'm the attorney for the appellant, Edwin Torres. I've requested three minutes for bottle talk.  Three or four different matters. The first is that the Social Security regulations absolutely require a combination of impairments and a comparison to the listing of impairments. That's what the regulations say. If you have more than one impairment, the ALJ must combine all of those impairments and compare them in combination to the listings. All right, what did he have that qualifies here? He had many things, Your Honor. He had hepatitis C, cirrhosis of the liver. But you're saying he met the liver and the psychiatric listings, correct? In combination, Your Honor. In combination. Now, the argument is that he met each of those listings by themselves, but I think the stronger argument is that the combination of both. Judge Pisano did a terrific comparison to show that I was wrong about 505. The only problem with Judge Pisano is that he wasn't the ALJ. See, the ALJ is supposed to do that. Not Judge Pisano. So should we send it back to the ALJ? This is not the case you're suggesting, that the record is such that the qualification is established on the record that it should go back to the ALJ? The stronger argument, again, Your Honor, is that it should be sent back to a different ALJ. Why a different ALJ? Because this particular ALJ will not ever award benefits on a remand. I've had 130 cases remanded with this ALJ, and he's not paid one. Not one. Is this something you said? It's usually something I said, Your Honor, but I don't think in this case it is. I don't think he pays anybody's remands, to be quite honest. But in some black lung cases, and we've done it with some regularity in immigration cases, going back to a different immigration judge. Do you know of any authority for that? I think it was an ALJ case where we sent it back to, and it's the chief ALJ judge, I guess, that assigns the cases. And he responded by acknowledging that the case had been sent back. We recommended, which is all we can do is recommend. We recommended that he go to a different ALJ. His response was, thank you very much, Mr. Circuit, but it's my court, and I'll decide who gets the case, and he sent it to the same judge. Understood, Your Honor. All I can ask is for this court to make such a recommendation, you know, if the chief ALJ doesn't want to follow that recommendation. So what you're saying now is all we can do is recommend? I believe so, Your Honor. There's no allegation of bias or... No, no, no, no. As opposed to ordering it. I think ordering... I don't tell the court what to do, but, you know, I think ordering is within your purview if you feel that the ALJ did not do his best here in terms of combining all the impairments. Let's not forget, the claimant suffers from anemia. He didn't mention that. The claimant suffers from a personality disorder. He didn't mention that. The claimant has hallucinations, auditory, and visual. He didn't mention that. Put all of those together and then tell me, the district court judge was 100% correct. Maybe he just misses meeting 5.05F3 because he doesn't have the promising elevations. Well, isn't the decision that we're reviewing, though, is the decision of the district court, and as opposed to the ALJ? I don't think so, Your Honor. No, I think you're... No, I think you're right about that. It is, and I don't know why, because it comes to us from the review of the district court, but you're right, all of our cases say that we're reviewing the ALJ decision because he can't... Yes, because the district court sits in appellate review. It's not a trial. My point here is that you can't just say he doesn't meet the listings. You've got to combine. Well, what about the argument on page 23 of the red brief that he had to show liver disease by liver biopsy and either the ascites or the serum bilirubin or something else, and it's not enough that he have one or some of the required criteria. He has to satisfy all of the criteria. No argument in order to meet a listing, but the regulations say you are disabled if you meet or equal a listing. Those words mean something. What would be the equivalence there? Well, there you go. If you go through 5.05 as the defendant did and as Judge Pisano did, you'll see that, well, he has hepatic cell necrosis. He has cirrhosis along with hep C, but he may not have repeated abnormalities of prothrombin time and enzyme indicative of total hepatic dysfunction. That may be true, but he also has anemia, and he also has one eye, and he also has three different diagnosed psychiatric limitations, and he also has bad knees, which isn't in the decision. That's what equal means. The reason for the regulations, why they say equal or meet is because they don't want an ALJ to evaluate a person by carving them into little pieces. It's an entire person who goes to work, and it's an entire person who doesn't go to work, who can't go to work, so you just can't say, well, he has bronchitis, so he shouldn't work at the bus depot, and he only has one eye, so he should avoid machines or heights, and he has a bad back, so he can't bend all day. But he also has a liver disease. Two types of liver diseases. The ALJ absolutely admits that he has hepatitis C and cirrhosis. Those are two different things. Now, he was fired from his last job because of attitude. You argue that that's because of his psychiatric condition, but we really don't know whether he had a bad attitude and he was otherwise capable of performing. We really don't know anything more than that. I think it's a material one, and I'll tell you why. No, no one can prove that he just wasn't having a bad day, but he had that job for, I believe, over 10 years. So if you have a bad day and you're working here for 10 years, people let it slide. He had a psychiatric condition. Interestingly, what Your Honor is suggesting is what the ALJ is really suggesting. If he didn't have a bad attitude, he'd still be working. Okay, but then how can the ALJ then say, well, his psychiatric disorders, and he only mentions one, although he has three, his psychiatric disorders were really... But he mentioned depression. Yes, but he also has bipolar, he also has a personality disorder, and he also has an adjustment disorder. Well, bipolar is only one diagnosed one time. But he's taking Lillian for it. He's taking a little bit for it. Yeah, he's taking a few medications. My point is, he says, well, the psychiatric problem really hasn't caused restriction in daily activities or social interaction. It's only mild. That's why he doesn't need 12.04. But it's not mild. Number one, he got fired for a bad attitude after 10 years. Number two, we have a psychiatric report that says, socially, he appeared to be withdrawn, isolated, provoking rejection from others by his behavior. He reported marginal contact with people except for his immediate family. That's transcript 242. The ALJ doesn't mention that. If he didn't hold a job for 10 years, how should we factor that into analysis? Plus, his earnings record is terrific. It's terrific. Four quarters in the last 20 years. I think he just won the year. Otherwise, he's got a perfect earnings record. He didn't make $150,000 a year, but he worked for four quarters with a blind left eye in a very handy job in an iron foundry, I believe. I'm having a hard time following your argument for this reason. It seems to me in your brief, your argument is that, well, maybe no particular impairment met or exceeded the listing, but in combination, it does exceed it. And the ALJ didn't really sufficiently analyze this combination of effect. But you don't seem to be arguing that. You hit this impairment. You say, yeah, that exceeded or met it. You hit this one. I still don't know your argument on how the combination of whatever impairments you want to depend on meet or exceed the listing. Well, Your Honor, the regulations require the combination. Can I read them? Can I read all of them? Well, I don't know what the regulation is, but I don't understand your argument, you know, of how, I mean, what impairments, even though individually they don't meet the listing and what combination, you know, meet or exceed the requirement of regulation. Well, the argument is as follows, Your Honor. We are saying that he equals 5.05F3. Because even if he doesn't have the prothrombin blood enzyme levels that are required, instead of that, he has anemia. Instead of that, he has degenerative disc disease. Instead of that, he has a psychiatric impairment. That's what medical equivalence is. Even if you meet the listing, you don't. So what does equivalence mean? Equivalence means the entire person may take all of the severe impairments and have to combine each, have to compare each impairment with the listing. They then have to combine them all to see if the whole person is disabled because of the severe impairment. How do you do that? Each of the ailments on the listing is written in the disjunctive. So you can have A or B or C. Sometimes you have to have A and B followed by C or D or sometimes followed by C and D. So there seems to be, I totally agree with what you're saying about meets the listing or its equivalence. But the equivalency, in a sense, is built into the disjunctive wording of the listing. I don't think that's correct, Your Honor. I don't think that's correct. In other words, in order to... Well, how do you... What authority do you have for the meaning of equivalence that you're giving him? And how do you do that? How do you decide, well, his liver's worth maybe four points. It should be worth ten points because his liver's not, it's bad, but it's not that bad. His anemia is not quite to where the listing is, but it's almost there, which is the equivalent of maybe one bad knee. How do you do that? Well, that's the beauty of what the ALJ is supposed to be doing. That's why they call medical advisors experts, et cetera. The authority, to answer Judge Randell's question, or I guess all of your questions, the authority is the regulation itself. The regulation itself says if you have more than one impairment and none of them meets or equals a listed impairment, we will review the symptom science laboratory, et cetera, to determine whether the combination of your impairments is medically equal to a listed impairment. That answers the question. In other words, you're asking me, well, if he just misses here and he just misses there, how do you have the authority to combine them and say they're equal? Well, that's what the regulation says. Well, it's not the authority. How do you do it? But I guess you're saying it doesn't matter. The regulation says you have to do it, and you just, you go through it, and that's what the medics go through. And the regulations specifically say that you have to do because the regulations say even if you don't meet a listing on point, you still have to combine, and he didn't come up, and that's why he's got to go back. There are other reasons, but my time is up. Thank you, Mr. Hoffman. Thank you. Good morning. Good morning. May it please the court, my name is Richard Hill, and I represent the Commission of Social Security in the present case. One thing I'd like to address at the outset, Mr. Alter repeatedly asserts that he's very close on one or more of these listings, and it's really as simple as taking a little bit from another listing, another condition, and adding it on top. I would submit that his assertion that he's close on any of these listings is false. Well, close or not, what he just read from the regulation would say you take what you have from all of them and look at it together, and maybe they're not all totally close, but given it all, you have to look at all of it. Did the ALJ do that here? Absolutely. Where is that in the ALJ's analysis? The ALJ's decision? Yes. I'm referring to page 20 of the administrative transcript. This is page 5 of the ALJ's decision. It's A27 in our appendix. Regarding steps 2 and 3, the evidence establishes the existence of a severe impairment involving left eye blindness, diabetes, hepatitis C and cirrhosis, degenerative disc disease of the lumbar spine, bronchitis, and depression, but does not disclose any medical findings which meet or equal in severity the clinical criteria of any impairment listed in appendix 1, subpart P, to regulations 4. It's evident that he is looking at multiple impairments. He's looking at each of the primary impairments alleged by this individual. I don't know, but that's not the analysis of, you know, if you combine them, they still don't equal. He does not use the word combine. He certainly doesn't. Well, that's the question, though, then. Well, where's the analysis? I would submit he is looking at the findings in the aggregate. He makes it clear that he's referring to findings. He's just started the sentence by acknowledging that there are six different impairments of substance of a level that meets the commissioner's severity criteria. But then he goes and looks at each one individually as to whether they meet the listing, doesn't he? He definitely does. So where is it that he comes to? But he has said initially he's looked at them both in terms of meeting and equaling the severity. No, but what is the combination analysis? Looking at them in combination. I would submit that that is the combination analysis. That is what? The paragraph we just read? Yes. If that's it, I think it's grossly deficient. The analysis, though, is also supplemented by his discussion of each of these individual listings and of the medical findings regarding each of these individual conditions. It seems that he ignores the medical findings. He ignores the testimony of the doctors or the evidence that came from the doctor that examined him for workers' comp purposes. And we understand that the workers' comp determination is not controlling for Social Security. But the medical evaluation that those doctors gave is nevertheless relevant. And the ALJ here seems to just disregard those medical examinations and conclusions because they were for workers' comp. And also the subjective pain, that really troubled me. He totally discounts this patient's complaints of pain. And even the hypothetical and some fun, oh, that's even a podcast for it. But even the hypothetical answer that he goes on the part, the last part of the hypothetical answer, that there are other jobs available in the economy, but forgets the fact that if you factor in pain, which seems to be substantiated by the record, then the answer is no, there are not jobs available in the economy. Let me respond to those points in order. With regard to the doctors who examined him for workers' comp purposes, I would submit he does not disregard their findings. He does reject their conclusions. The assessments that they provide, whether you're assessing partial degrees of disability, are concepts that are completely foreign to the Social Security analysis. This court, on more than one occasion, has recognized that there is no way to translate those findings into the criteria that the Commissioner uses. We have a listing, but a bad heart is a bad heart. And maybe you look at it differently for workers' comp than you do for Social Security. But if you have a bad heart when you go to the doctor who is examining you for workers' compensation, it doesn't get better when you go across the hallway to the doctor who is examining you for security. I absolutely agree, except I would submit that these findings don't show. Absolutely, he has a liver condition, he has diabetes, he has some degree of musculoskeletal disorder. I picked a bad example. A bad heart may be the only thing he doesn't have. But if you look at the clinical findings, the record, including those doctors, really very little in the way of positive clinical signs and findings. From a musculoskeletal point of view, this individual is virtually intact in terms of their intermotion. He's got a bad back. He's got a bad back, but it doesn't result in significant limitations of his ability to move. It doesn't result in neurological deficits. The ALJ says, oh, he does household chores and he walks. But the testimony about the household chores is that he barely lifts a finger. And, you know, he may walk a block, but he has to stop. The testimony, however, is different than what he said to SSA when he filled out the initial questionnaires at the front end. He made it clear at that point he was able to take care of his personal needs, albeit on a somewhat slower basis. He indicated-wait just a second. Yeah, give me the-because it's not very clear. That was offensive. It's very sketchy. What he did with the ALJ. And I was looking in the record for some indication that, yes, he makes his bed, does the dishes, helps with the chores. There's just nothing in there. And to my mind, his testimony, current testimony, just elaborates on- Okay. Transcript 153, this is the transcript of the administrative record. Right. He indicates that he made coffee, helped with chores, did a lot of reading and watching television, and visited with family and friends. My nephew and roommate do the chores around the house as I sometimes try to attempt to help. I try to make breakfast as easy as possible. I try to continue doing my chores, the easy ones. My meals get done by my nephew and friends. I have to finish often because I can't finish because of continuous pain. Someone always travels with me. The thing about TV, the ALJ made the activity of watching TV sound like he's training for the decathlon. He says, this guy can do household chores. He watches television. Now, there's something that I guess I will agree upon. I absolutely agree. In and of itself, watching television is not a particularly active- Sure, sure. It does not determine or show a whole lot. The ALJ, however, did not look just at the one activity. He looked at the aggregate. He did not look just at the daily activities. He looked at the clinical signs and findings. Tell me what there is to show that this man can move around and get out of bed and get to work and function. Dr. Merlin, the Social Security Administration's examining consultant, found that he could sit, stand, walk, handle objects, hear, speak, and travel. Should not lift or carry heavy objects and should avoid work with machinery and motor vehicles. Does that include accepting the complaints of pain, what you just read? That's based on his actual evaluation, which includes, presumably, whatever manifestations of pain are evident during the time of that examination. Which doctor? That's Dr. Merlin, who conducted a physical exam for SSA. But he doesn't say he can sit for two hours at a time, et cetera, et cetera. He just says he's capable of those physical things. I would argue that it's a reasonable presumption that the inference, though, is that he can sit without limitation. He says he can sit. He's not putting any limit on that. There's also a state agency physician, included in the record as well, at transcript 230-239, who actually translates Dr. Merlin's findings into somewhat more specific findings. Anybody who's ever said, oh, will you hire this guy? I mean, half the day is spent taking medications. I mean, the guy is a wreck. He's blind in one eye. He's got back pain. He's got liver disease. He's got bad knees. As I said earlier, the only thing he doesn't have is a bad heart, and that's probably only because they haven't discovered that yet. Of course, the question about whether I or anyone else would hire him, it doesn't factor into the statutory definition of disability. Well, whether or not anyone else would hire him, that does enter into it. No, it absolutely does not. It's whether he can perform the jobs, physical and mental limitations and abilities. The hire ability is definitely excluded from the definition of disability in the Act. Except that's what the occupational expert is supposed to assess. No, what he's supposed to do is, assuming that the individual has— You're saying if there's a job that he can do, whether or not he can get hired for it, it doesn't matter. Not whether he can get hired, but whether he would be capable of performing the work. That's what I'm saying. You're saying if there's a job that he can do, whether or not he can be hired, it doesn't matter. Precisely. Mr. Hill, let me go back and ask you to tell me what you think. You know, the regulation that Mr. Alter read from about what the commissioner is supposed to do with the combination of impairments, none of which meets the listing. What is the meaning of that regulation? What's supposed to be done under that regulation? I think Mr. Alter is correct that there has to be a determination made whether the aggregate findings that relate to the multiple conditions, whether they are of a medical equivalence of the findings that would be required by one or more of the listings. Do you think the ALJ here went through that drill? I think the ALJ's decision could have been articulated further. I absolutely agree. I think that he provided the basic framework to indicate that he has made the necessary consideration. The district court addressed this point specifically, and in fact relied on an earlier unpublished decision of this court to find that the recitation of the fact that he had considered the medical findings in determining that he neither met the rate for the listing combined with his review of the relevant medical evidence was sufficient to pass muster. As I said, it's not by any means the perfect analysis, but I would submit that it's sufficient for purposes of review by the court. I want to go back to what he said to dismiss the workers' comp doctors. He is saying that no significant weight is accorded to the limitations assessed by workers' compensation doctors. Harmony, Tobias, Crane, Klein, reports were obtained to support workers' compensation claims. The assessments of limitation are excessive and not supported by objective medical evidence. Now, again, those conclusions are not conclusive for sort of street purposes, but to say that to automatically just disreject four doctors who examined this guy because their conclusions are not supported by objective medical evidence. But I think what he's saying is they're not supported even by their own findings. If you look at those examinations, they do not demonstrate marked clinical or laboratory abnormalities. The doctors for each of them provide relatively benign findings and then attach a percentage, 20%, 30%. Those conclusions nailed in or correctly concluded don't correspond with their own findings and in addition are not considered to be opinions that we would give any significant weight to in terms of that statement of disability because it is an assessment rendered in another context for another program. The latter part I agree with. It seems to me he has to at least explain why he's not, well, he's saying he did explain it, he's saying because the conclusions are not consistent with the medical findings. Right, I believe that's the statement you just read from the ALJ's decision. Just getting back to you, Judge Rendell, you had asked about whether there were specific findings or specific limitations noted by any of the doctors. The state agency review physician who looked at this found that he could lift up to 20 pounds occasionally, 10 pounds frequently, could stand or walk about six hours in an eight-hour day, could sit about six hours in an eight-hour day, could push or pull without limitation, could never climb ramps, stairs, scaffolds, could occasionally bounce, stoop, kneel, crouch, and crawl. Does that factor in the complaints of pain? This examined review physician is reviewing the entire record that is available to him at the time that he looks at the record. That includes the examining doctor's reports, which include not only the clinical science and findings but also the history that's provided to those doctors. So the history and complaints are, in fact, taken into account in the exam. I know what you're saying, but just combining the headaches and the back pain, just those two things alone to say that this guy can push and pull without limitation. I understand that on a certain level I think it's counterintuitive to believe that this person can work because they do have multiple impairments. Well, don't put the conclusion on work. I'm just talking about that, what you just read. Push and pull without limitation for someone who has the kind of headaches. I don't think the word migraine was ever attached to it, but the way he describes the headache, it certainly is suggestive of that level of pain, of a migraine. And then he added to that back pain, which is clinically supported by the structural problems he has in his back. I have to respectfully disagree. I mean, the problem is he has lots of complaints. He has very few clinical science or findings to corroborate any of those. Well, wasn't the degenerative disc disease, wasn't that diagnosed? Unfortunately, I would submit with all due deference that probably the three of you, the two of us, and most of the other people, over 40 in this room, have degenerative disc disease. I mean, the degenerative processes occur naturally. The critical thing is not simply whether a person has an X-ray or a CAT scan that shows a certain amount of narrowing of the disc space. The question is what are the impact on the functionality. And that requires looking at clinical signs such as range of motion, straight leg raising. It requires looking at neurological signs such as reflexes, motor loss. Again, this record, he absolutely has some degree of arthritic condition in his back and perhaps in his knees. He does not, in our judgment, respectfully have the type of requisite clinical science and findings that would demonstrate that this is… Is the pain substantiated? Is the medical record there to substantiate the complaints of pain? I would say that it is substantiated to the extent… The ALJ recognizes this individual should not be doing heavy lifting or carrying. He nonetheless found that he could operate and could function at a lesser exertional level. So he is taking into account these complaints to some degree. He actually found limitations even beyond those established by the non-examining physician. For instance, the non-examining physician didn't believe that there would have been any environmental restrictions regarding environments of dust, smoke, fumes. The ALJ thought that given the history of a bronchitis or asthmatic condition that an additional limitation was warranted. I would submit that he has reasonably weighed the totality of the evidence. He's looked at the subjective complaints. He's looked, very importantly, at the objective evidence. He's looked at the treatment that this individual has received, treatment with which he has actually responded favorably in several important areas, including both the liver and the mental status. And based on all of that, he's concluded that this individual could work, albeit at a fairly limited length, minus the various non-exertional environmental restrictions that he identified. What do you make of Dr. Fleischman's statement that, as of July 2004, he's totally disabled from the multiplicity of his medical conditions, that he has new-onset diabetes and evidence of moderate liver damage? The opinion in which that is rendered is a fairly terse, somewhat conclusive. It does not provide a great deal of recitation of relevant clinical science, laboratory findings, et cetera. But the most important deficiency or problem with that opinion is that it purports to conclude disability. Whether an individual is disabled or unable to work are questions of law that are reserved uniquely to the commissioner. The first part of the question, though, is troubling. Given the reality of how doctors dictate their notes or scribble their notes, you're suggesting that because the notes are so terse that we ought to disregard his clinical findings? Not at all, no, sir. The ALJ, I believe, correctly looked at the clinical science and findings of both the treating and examining physicians. All I'm saying is that this very short narrative report does not necessarily reflect or correlate with those findings. And what we have instead is a conclusion of disability. In an earlier decision of this court, Dixon v. Commissioner, the court actually held that an opinion on the question of disability is not a true medical opinion and need not be given any special significance by the commissioner in assessing disability. It does tend to suggest that someone with a medical background views the combination of these certainly not trivial or... I don't disagree. The problem is that when a doctor makes that assessment, I mean, they may be looking at factors beyond the factors that we would view to be relevant under the statute of regulations. They may, for instance, consider hireability or a person's other social or personal situation. They may not be fully aware of what the disability test is under the Social Security Act. The test is rigorous. The test is specific. Doctors are not necessarily informed about the specific requirements of sedentary life, medium, and heavy work. So the commissioner has made that decision as a matter of policy that we will give no particular weight to those kind of opinions. This court, as I said, has recognized and accepted that principle. Mr. Hill, are you local or did you come from... I'm with the Office of the Regional Chief Counsel of New York City for the Social Security Administration. You're very good. I'm not sure you're going to win, but you're very good. I see that my time is up. Unless you have any further questions... I have none. Thank you very much. I appreciate your time. I'm not sure you're going to lose. I didn't mean to suggest that one way or the other. I'll keep hoping. All right. Okay. In my three minutes, let me just sum up in terms of what we really want from the ALJ. In this case, in every case, we just want an explanation. If you're in Step 3, explain to me why he doesn't meet the listings and his combination doesn't equal a listing. Explain why. Don't say he doesn't meet 5.05 because he doesn't satisfy A through F. Well, what does that mean? What did the district court judge do wrong? The district court judge shut me up. That's what I want the ALJ to do. You say... That's what I want my colleagues to do. You say he meets 5.05. I'll show you he doesn't. That's what the ALJ is supposed to do. And then I don't show up here anymore. He doesn't even say... The ALJ doesn't even say that he combined all of those. There is no evidence of such a combination. Explain it. That's the first thing. The second thing. I do not accept the claimant's complaints. Why? Because he's not telling the truth. He's not credible. You see, he makes coffee, goes to church, and he watches TV. He reads. Yeah, he said... And the ALJ says this specifically. He says, although he claimed... While the claimant testified that he did virtually nothing, the record indicates the opposite. What is he doing? He's reading. He's watching TV. If you asked me what I did this weekend, I would say I did nothing. Well, I read, I watched TV, and I made some coffee. But that's it. He says that the opposite is true. That's not an explanation, especially since the regulations and the rulings absolutely tell you you cannot just say, I don't accept the complaints. You have to tell us why the evidence tells us that the complaints are not true. What's your view of the role of the pain and subjective complaints of pain here, and the extent that they were or were not considered hypothetical? The hypothetical is garbage in, garbage out. Whenever you tell a vocational expert, it's like putting it into a computer. That's why Lester Hill says, well, he did even acknowledge that his bronchitis, he shouldn't work around the excessive fumes. Nobody works around excessive fumes. We have ocean now. Nobody works around excessive fumes. He knows, the ALJ knows, just like I know, what the answer is going to be from the vocational expert once he gives you a hypothetical. The question is, what's the hypothetical? The hypothetical doesn't include pain. The hypothetical already concludes you can do light work. Well, that's true, but that's why I asked the question where I did. Maybe I'm wrong, but I thought that once the pain was included in the hypothetical, then the expert agreed that the guy was not going to work. Exactly. Pain is never in the hypothetical. Because we know the answer. If the pain is so strong, Mr. Vocational Expert, that it can't concentrate, can he work? No. Pain is never in the hypothetical. The question is, how does he get to light work? That's the question. Because if it's sedentary work, he wins. As a matter of fact, the day after the ALJ's decision, the ALJ's decision was on November 5th, 2004. He had a different attorney. We sent him down to Social Security, and guess what? As of November 6th, he's disabled. You know why? Because he's sedentary. Because we argued he was sedentary, and he wins under the vocational rules. Well, guess what? Another judge found that the next day, the next day, on the same evidence, the same hep C, the same cirrhosis, he's disabled. So why are we here? We're here about a different gap of time, different judge? We're here, yes, because of Ress Chudakoff. The ALJ says in his decision, not in the evidence, but he just says in his decision, I realize that there's a district court case and that the only issue before me is the day after the ALJ's decision, because until that decision is overturned, the claimant is barred from collecting disability. Well, then let me go back to what you started out with, about requesting a different ALJ. I'm not sure I understand you correctly. You're saying that there was another application submitted, and that application, based on the same evidence, he was ruled disabled, but the problem is you've got Ress Chudakoff in this case. That's correct. Does this go back to a different ALJ? If the decision here is vacated, then there's no Ress Chudakoff, and you've got a ruling that he's disabled. Well, once it's sent back, then there's going to be a new hearing. I asked that it go back to a different judge because I think this judge clearly demonstrated that he really wasn't going to evaluate the evidence according to the plain meaning of the evidence. So, yes, if this matter is remanded and if this court orders or suggests or recommends to a different ALJ, that would be great because then we'd have a new ALJ, a fresh pair of eyes, take a look at this evidence. Don't forget. That's not an argument that you made in your brief, is it? What? That it should be sent back to a new ALJ. No. Is it fair to consider, since the other side didn't have a chance to respond to that? In fact, he asked for sanctions against you, didn't he? Did he ask for sanctions against me? Didn't you read his brief? I did. I don't remember the sanctions part. You just read the good part. Well, we did impose sanctions against you, Mr. Roland. When was that? When was that? October. Of 07? I think October of 07. It was definitely after this brief because this brief does contain a bit of hyperbole. Well, hyperbole, but not insulting hyperbole, Your Honor. Well, that's good. But thank you for bringing up my sanctions one and all. Well, Justice Schema probably didn't know, and it's all fair. But the red brief on page 44 says, Having failed to abide by the rules of the circuit, the commissioner asked this court to undertake any actions it deemed appropriate. And then it cites this very recent case, Frazier v. Commissioner. There's even a mortgage he takes you on. So all I'm saying, you don't know anything. You know, you didn't ask for a remand to a different judge. You didn't even respond to that sanctions request. Well, what response could there be? I don't know how to respond to that. I've been responding to that for the last six months. But that has nothing to do with the merits of the case. Don't kill the claimant because you don't like the messenger. The message is very clear here. And the message is that nothing was explained. Not his individual functional capacity. Not why the pain was rejected. And not the equivalence of the listings. When Judge McKee asked Mr. Hill about the workers' compensation doctors, I want to be able to tell you, he can eject any doctor he wants. He's got a reason. We understand. He just can't say because the medical evidence doesn't support it. Why don't you tell us what part of the medical evidence doesn't support it? We thank you for your argument. Thank you very much. The case is very well argued on both sides. A big matter under advisement. And the last case is U.S. v.